Ricky **ALBRITTEN**, Plaintiff,

v.

**DOUGHERTY COUNTY, GEORGIA,**
et al., Defendants.

No. 1:92–cv–144(WLS).

United States District Court,
M.D. Georgia,
Albany–Americus Division.

Jan. 3, 1997.

Rodney M. Keys, Albany, GA, for Plaintiff.

William Spencer Lee, IV, Albany, GA, Dawn Jordan, James R. Morgan, Jr., Winston–Salem, NC, for Defendants.

### ORDER

SANDS, District Judge.

Presently before the Court is Defendants' motion for summary judgment.

## Background

On April 4, 1992, Plaintiff Ricky Albritten left a bar known as the House of Jazz, and while driving his car on Highland Avenue, collided with a parked car that contained three narcotics officers on stakeout. Albany police officer O.C. Conley was summoned to the scene of the accident. After determining that Albritten was intoxicated, Conley arrested him for driving under the influence, driving without insurance, and colliding with a stationary object. Albritten was taken by Conley to the Albany Police Department and given an Intoximeter 3,000 breathalyzer test. Plaintiff blew a .30 gms, three times the minimum for a DUI charge. Officer Conley next transported Albritten to the Dougherty County Jail for intake and processing.

As to the preceding facts, the parties are in substantial agreement. However, what transpired subsequent to Albritten's arrival at the Dougherty County Jail is hotly disputed. Upon entry into the jail, Albritten was asked by Deputy Sheriff Ronald Roland, not a named defendant, to move up against a nearby wall so that he could be searched. The defendants argue that Albritten became belligerent and uncooperative as Deputy Roland attempted to conduct a search of his body for weapons and/or drugs, and that Albritten even swung his elbow back towards Roland in an effort to prevent the search. Only at that point, according to the defendants, did Officer Conley, Deputy Jon Segroves, and possibly Deputy Donna Grigsby assist Deputy Roland in trying to gain control of Albritten. The defendants contend that only the minimum force necessary to gain control was applied, and that once control was maintained, Albritten was led to an isolation cell by Roland, Segroves and Conley. Once at the isolation cell, Deputy Kevin Frier arrived to provide further assistance. The defendants state that Albritten still would not allow himself to be searched, and thus Conley, Roland, Segroves, and Frier held Albritten and removed his pants from his body in order to complete their search. After tossing his pants back to him, defendants contend that Albritten charged the attending officers, at which point they wedged him against the wall while Deputy Grigsby brought leg restraints. After attaching one of Albritten's legs to the cell wall with a leg restraint, defendants contend that they left Albritten in the isolation cell with his clothes.

Plaintiff's version of events at the jail, though similar to defendants' as far as the sequence of events, is glaringly different as far as the context and details of the police officers' conduct. Albritten agrees that upon entering the jail he was ordered to get up against the wall by one of the deputy sheriffs. However, Albritten asserts that when he was slow in responding to the command, apparently due to his intoxication and discomfort from being in handcuffs, one of the sheriffs approached him from behind and said, "Get against the wall." Albritten then said, "Okay, I'm fixing to get up there.... You ain't got to be treating me like that." Albritten contends that at this point, one of the sheriffs said, "I'm tired of y'all niggers," and forcefully shoved Albritten into the wall. At that point, Albritten argues,

> [T]he other ones just voluntarily jumped in and they grabbed me around my neck and they started choking me and they started pulling me and dragging me. And they put me in this tank where they started hitting me and kicking me, kneeing me in the ass, kneeing me in the sides and stuff like that, and tore my clothes off. After they had tore all my clothes off, then they got the handcuffs and grabbed me by the foot. They got this bar, this iron bar that go around in there in the drunk tank. They had strapped my leg to that in there naked.

The record indicates that during the struggle in the isolation cell, other jail inmates started a "mini-riot" —lighting toilet paper, throwing fluorescent light bulbs, etc. While the record is not absolutely clear on the causes of the riot, in the light most favorable to the plaintiff, it appears that the small uprising started when other inmates heard the noise of the struggle between Albritten and the jailors.

As a result of the rioting and in response to a potentially suicidal inmate, Jail Administrator Hollis Howze was summoned to the jail. Howze arrived at approximately two o'clock in the morning, and visited Albritten in the isolation cell. No physical force was exercised by Howze upon Albritten. Shortly after Howze's visit, Albritten made bond and was released.

Deputy Sheriff Franklin Goodwin was the shift captain, or supervisor, of the Dougherty County Jail at the time of Albritten's arrest. The record indicates that Deputy Goodwin was not directly involved in any use of physical force against Albritten. However, the record shows that Deputy Goodwin was present at the time of Albritten's arrival at the jail, and that Goodwin witnessed some, if not all, of the initial use of physical force against Albritten.

### Discussion

### I. Fourth Amendment Basis For Plaintiff's Excessive Force Claims

Section 1983 "is not itself a source of substantive rights," rather it provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 2695 n. 3, 61 L.Ed.2d 433. Thus, "[i]n addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989). In the instant case, plaintiff alleged that his rights as guaranteed under the Fourth, Fifth, and Fourteenth Amendments were violated by the defendants' alleged use of excessive force.[1]

In *Graham,* the Supreme Court recognized that the ultimate legal analysis of a § 1983 claim based on the use of excessive force prior to a criminal conviction can be made pursuant to either the Fourth or the Fourteenth Amendments, depending on the timing of the alleged constitutional violation. The Supreme Court held:

*[A]ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach.

*Id.,* at 395, 109 S.Ct. at 1871 (emphasis in original). However, the Supreme Court went on to state that the substantive due process rights of the Fourteenth Amendment attach at the moment of pretrial detention.

Our cases have not resolved the question whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond that point at which arrest ends and pretrial detention begins, and we do not attempt to answer that question today. It is clear, however, that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment.

*Id.,* at 395 n. 10, 109 S.Ct. at 1871 n. 10 (citing *Bell v. Wolfish,* 441 U.S. 520, 535–539, 99 S.Ct. 1861, 1871–74, 60 L.Ed.2d 447 (1979)). Thus, subsequent to *Graham,* two concepts are certain: (1) claims based upon the alleged use of excessive force in the context of an arrest, investigatory stop, or other "seizure" should be analyzed exclusively under the Fourth Amendment; and (2) claims based upon the use of excessive force subsequent to the initiation of pretrial detention may be analyzed under the Fourteenth Amendment and possibly under the Fourth Amendment as well.[2]

---

1. All "counts" in the original, first amended, and second amended complaints are based upon alleged violations of the Fifth and Fourteenth Amendments. None of the claims for relief specifically refer to the Fourth Amendment. However, in the "Jurisdiction and Venue" sections of all three versions of plaintiff's complaint, plaintiff states that his claims for relief arise, in part, under the Fourth Amendment. The Court finds that the factual allegations of the complaint, when read in conjunction with the jurisdictional reference to the Fourth Amendment, sufficiently satisfy the notice pleading requirements of the Federal Rules of Civil Procedure such that the Court shall consider the Fourth Amendment as a potential basis for plaintiff's excessive force claims.

2. In the Eleventh Circuit, the law is not clearly established as to whether the Fourth Amendment applies to claims of excessive force subsequent to the initiation of pretrial detention. *See Vineyard v. County of Murray, Georgia,* 990 F.2d 1207, 1211 (11th Cir.1993); *Wright v. Whiddon,* 951 F.2d 297, 300–01 (11th Cir.1992). However, for the reasons discussed below, the Court finds that the undisputed facts in the present action establish that pretrial detention had yet to begin at the time of the defendants' alleged use of excessive force. Thus, the ambiguity of the law noted in *Vineyard* and *Wright,* is of no moment to the present analysis of plaintiff's claims.

Although the Supreme Court has well defined the moment at which arrest occurs, *see California v. Hodari D.*, 499 U.S. 621, 624–29, 111 S.Ct. 1547, 1548–52, 113 L.Ed.2d 690 (1991); *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968), the law has failed to produce a definitive parameter for the moment at which the process of arrest ends and some other form of custody begins. For this reason, lower courts have grappled with the question of when *Graham's* mandate of exclusive reliance on the Fourth Amendment ends, and analysis under the Fourteenth Amendment should begin, either concurrently or exclusively. The difficulty of this inquiry is compounded by the fact that, as discussed below, some courts have recognized an independent period of custody that lies between the end of the arrest process and the beginning of pretrial detention. This period is often referred to as post-arrest, pre-charge custody or post-arrest, pre-arraignment custody. In circuits that recognize such a custodial continuum, a determination that arrest has ended simply leads to the question of what, if any, constitutional rights are implicated by the police use of excessive force during the post-arrest, pre-charge period of custody.

Although the Eleventh Circuit has not definitively shaped the contours of the custodial continuum in this circuit, in *United States v. Myers*, 972 F.2d 1566 (11th Cir.1992), *cert. denied*, 507 U.S. 1017, 113 S.Ct. 1813, 123 L.Ed.2d 445 (1993), it indirectly recognized the existence of a post-arrest, pre-charge custody period. *Myers* involved the criminal trial of a police officer accused of violating two arrestees' civil rights in violation of 18 U.S.C. § 242.[3] Specifically, the defendant police officer was accused of unconstitutionally shooting the two arrestees with a stun gun, after they had been put in a jail cell. The trial court instructed the jury to evaluate the defendant's actions under the objective reasonableness standard of the Fourth Amendment. On appeal, the defendant argued "that the Eighth Amendment standard of 'malicious and sadistic force applied for the very purpose of causing harm' should have been given instead." *Id.* at 1571. The defendant also argued that the Fourteenth Amendment "shocking to the conscience" standard should have been applied. However, because the Fourteenth Amendment argument was raised for the first time on appeal, the Eleventh Circuit refused to address it, stating that "the Fourth Amendment instruction is subject to attack only on Eighth Amendment grounds." *Id.* at 1571. The Court of Appeals went on to reject the defendant's Eighth Amendment argument. *Id.* at 1572. While this holding would seem to inherently confirm that the Fourth Amendment is the proper basis for the evaluation of a claim of excessive force in a post-arrest, pre-charge setting, the Eleventh Circuit narrowed the applicability of *Myers*, stating:

> Although we uphold the instruction given, we wish to make it explicit that we are not deciding that the Fourteenth Amendment's "shocking to the conscience" standard does not apply in evaluating the use of excessive force by the police in post-arrest, pre-charge cases. That issue is not before us. We hold only that it was not plain error for the district court to give the instruction it did.

*Id.* Thus, *Myers* does not definitively answer the question of what, if any, constitutional rights are implicated by the police use of excessive force during post-arrest, pre-charge custody, and this question remains unanswered in the Eleventh Circuit.

Based on a review of the holdings of the Courts of Appeals of other circuits, and for the reasons discussed below, this Court finds (1) that the undisputed facts of the instant action indicate that plaintiff's arrest had not ended at the time of defendants' alleged use of excessive force, and (2) that the Fourth Amendment applies to plaintiff's excessive force claims even if plaintiff was in post-

---

**3.** 18 U.S.C. § 242 is essentially a criminal counterpart to 42 U.S.C. § 1983, reading in relevant part:

Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race than are prescribed for the punished of citizens, shall be fined ... or imprisoned....

arrest, pre-charge custody at the time of the use of such force.

Of the Courts of Appeals which have addressed the issue of constitutional protections along the custody continuum, all· have recognized that the protection of the Fourth Amendment against police use of excessive force lasts beyond the moment of initial seizure. To begin with, several appellate courts have recognized that an "arrest, investigatory stop, or other seizure," as contemplated by *Graham* may pertain to more than the initial moment of physical restraint.

■ Prior to *Graham*, the Ninth Circuit established the concept of continuing seizure. *See Robins v. Harum*, 773 F.2d 1004, 1010 (9th Cir.1985). Citing *Robins*, the Sixth Circuit adopted this concept, holding that "the seizure that occurs when a person is arrested continues throughout the time the person remains in the custody of the arresting officers." *McDowell v. Rogers*, 863 F.2d 1302, 1306 (6th Cir.1988). Thereafter, the Sixth Circuit affirmed its holding in *McDowell* as consistent with *Graham*, stating:

> Although *Lewis v. Downs*, 774 F.2d 711 (6thCir.1985) and *McDowell* both predate *Graham*, their holdings that no force may be used on fully restrained arrestees are fully consistent with *Graham* and have not been disavowed in any way by this court.... As explained above, [a Fourth Amendment jury instruction on post-seizure use of force] is not a "different standard" but merely an application of the reasonableness standard in the *post-arrest context* of *Graham*.

*Cox v. Treadway*, 75 F.3d 230, 235 (6th Cir. 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 78, 136 L.Ed.2d 37 (1996) (emphasis added). In the instant case, very little time had passed between Albritten's initial arrest and his arrival at the Dougherty County Jail. In addition, arresting officer O.C. Conley was still present at the moment of the initiation of the use of physical force against Albritten. It appears that, at the very least, Officer Conley maintained joint custody over Albritten at all relevant times because the transfer to the Dougherty County jailors was incomplete until the use of physical force against Albritten had ceased.

In addition, defendants' stated purpose for using physical force against Albritten at the Dougherty County Jail was to conduct a search for weapons or drugs which may have been overlooked during the arresting officer's search incident to arrest. Thus, the very purpose of the admitted use of physical force against Albritten was to conduct a secondary or continuing search incident to arrest, indicating both a continuation of his initial seizure as well as implicating independent Fourth Amendment principles. The Ninth Circuit addressed a similar, though not identical, situation in *Hammer v. Gross*, 884 F.2d 1200 (9th Cir.1989), vacated en banc on other grounds, 932 F.2d 842 (9th Cir.1991). In *Hammer*, the arresting officer handcuffed the arrestee to a hospital room chair and wrestled him into submission in order to take a blood test to measure blood alcohol level. *Hammer, supra*, 884 F.2d at 1201–02. The Ninth Circuit held:

> "Because it involves the use of physical compulsion in connection with a search and seizure conducted as an incident of his arrest, Hammer's 'excessive force' claim is properly analyzed under Fourth Amendment principles."

*Id.* at 1204 (citations omitted). It is worth noting that while an en banc panel of the Ninth Circuit vacated this opinion on other grounds, in doing so it specifically noted agreement with the application of the Fourth Amendment to Hammer's excessive force claim. *See Hammer v. Gross*, 932 F.2d 842, 845 n. 1 (9th Cir.1991), *cert. denied*, 502 U.S. 980, 112 S.Ct. 582, 116 L.Ed.2d 607 (1991).

The Seventh and Fifth Circuits have established a narrower view of the applicability of the Fourth Amendment in excessive force cases. The Seventh Circuit appears to have rejected a broad concept of continuing seizure, holding that "presence in the jail and completion of the booking marked the line between 'arrest' and 'detention.'" *Titran v. Ackman*, 893 F.2d 145, 147 (7th Cir.1990). The Fifth Circuit also has found that the applicability of the Fourth Amendment in excessive force cases should be closely tied to the moment of initial seizure. Most recently, in *Brothers v. Klevenhagen*, 28 F.3d 452 (5th Cir.1994), the Fifth Circuit stated:

Once an individual has been arrested and is placed into police custody, and surely after the arresting officer has transferred the individual to a jail cell, the individual becomes a pretrial detainee, protected against force by the Due Process Clause.

*Id.* at 457.

Even under these narrower holdings, however, the facts of the instant case still warrant Fourth Amendment analysis. In *Titran,* the critical moment seems to be the end of the booking process. The deposition testimony of Hollis Howze indicates that Albritten had not been booked by the time Howze arrived subsequent to the challenged use of force. Howze told Albritten, "Now, I will offer you another phone call just as soon as we complete your process of fingerprinting, your booking, and you sign what you have got to refuse, what you can legally refuse." Howze further testified, "And I stood there, and I was in the jail while they processed him and gave him a phone call." Because other portions of the record are unclear about whether Albritten was booked prior to arriving at the jail, the Court specifically requested that the parties inform the Court on this issue by way of letter brief. In response to this request, the defendants' submitted a letter to the Court which simply stated that Albritten had been booked, without making any reference to the record. The Plaintiff's response to the Court's inquiry included a portion of plaintiff's deposition testimony that is very unclear as to exactly what transpired between arrival at the police station and delivery to the jail. As discussed above, it is the movant's burden to show that no genuine questions of material fact exist as to relevant issues on a motion or summary judgment. Based on Howze's testimony, there exists a genuine issue of material fact upon which a reasonable fact finder could conclude that Albritten's claims warrant Fourth Amendment analysis under the holding set forth in *Titran* because Albritten had yet to be booked when physical force was applied to him.

In addition, notwithstanding the narrow language quoted above from *Brothers,* the Fifth Circuit recognized in that case that "[a]lthough *the protection [of the Fourth Amendment] may extend beyond the time of initial apprehension,* Brothers had been arrested earlier in the day, had been processed by the Jersey Village Police Department, and had spent several hours in jail," before being shot while attempting to escape during a building transfer. *Brothers, supra,* 28 F.3d at 456 (emphasis added). In the present case, Albritten was arrested, brought to the police station, and then brought to the jail. The record does not indicate any break in the process occurring between the moment of initial seizure and the initiation of the alleged use of excessive force. Thus, even under the narrower Fifth and Seventh Circuit approaches, application of the Fourth Amendment to the present facts appears proper, if not required.

On a practical level, Albritten's temporary incarceration in the isolation cell seems to have been meant to sober him up until processing was complete. Thus, although Albritten was already in a jail cell during a portion of the challenged application of force, it appears that this period of incarceration was effectively a continuation of his arrest rather than the beginning of a period of detention awaiting judicial review.

In sum, because of (1) the proximity in time of defendants' use of force to Albritten's initial arrest, (2) Officer Conley's presence and apparent custody of Albritten at the time of the use of force, (3) the stated purpose of the use of force being to effect a secondary search incident to arrest, and (4) the apparent purpose of the incarceration as something other than pretrial detention, the Court finds that defendants' alleged use of excessive force against Albritten occurred in the course of an arrest. Accordingly, pursuant to *Graham,* Albritten's excessive force claims should be analyzed exclusively under the Fourth Amendment.

As stated above, the Eleventh Circuit has only indirectly addressed the issue what constitutional rights are implicated by the police use of excessive force during periods of post-arrest, pre-charge custody. *See Myers, supra,* 972 F.2d at 1572. However, even if the defendants' use of force in the present case is deemed to have occurred during post-arrest, pre-charge custody, the Court finds that the Fourth Amendment still would be the proper basis for evaluation of plaintiff's excessive force claims.

In *Austin v. Hamilton,* 945 F.2d 1155 (10th Cir.1991), the Tenth Circuit described "the custodial continuum running through initial arrest or seizure, post-arrest but pre-charge or pre-hearing custody, pretrial detention, and post-conviction incarceration ..." Upon reviewing a "twelve hour episode of unnecessary physical violence and inhumane treatment, ending in [the arrestees] release without charge," *id.* at 1157, the Tenth Circuit stated:

> We conclude that just as the fourth amendment's strictures continue in effect to set the applicable constitutional limitations regarding both duration (reasonable period under the circumstances of arrest) and legal justification (judicial determination of probable cause), its protections also persist to impose restrictions on the treatment of the arrestee detained without a warrant.

*Id.* at 1160. Based on this conclusion, the Tenth Circuit held that the Fourth Amendment applies exclusively to claims of excessive force "up until the arrested suspect's first judicial hearing." *Id.* at 1162.

Similarly, when presented with a claim of excessive force allegedly used in retaliation for an arrestee's complaint at the police station that his money was stolen during a search incident to his arrest, the Second Circuit held:

> We think the Fourth Amendment standard probably should be applied at least to the period prior to the time when the charged person arrested is arraigned or formally charged, and remains in the custody (sole or joint) of the arresting officer.

*Powell v. Gardner,* 891 F.2d 1039 (2d Cir. 1989). *See also Pierce v. Multnomah County, Oregon,* 76 F.3d 1032, 1043 (9th Cir.1996) (finding *Austin* and *Powell* persuasive in holding that Fourth Amendment applies to claims of excessive force during warrantless, post-arrest, pre-arraignment custody). In the present case, the undisputed facts show that no warrant was issued for Albritten's arrest, and that the alleged use of excessive force took place immediately following Albritten's initial seizure and prior to any judicial hearing.

The Court is also persuaded by the language of *Graham* itself, that the Fourth Amendment would apply during post-arrest, pre-charge custody. As discussed above, *Graham* left open the question of whether the Fourth Amendment could apply after the initiation of pretrial detention, but did not even raise the question of whether the protections of the Fourth Amendment faded at some point prior to pretrial detention.

> In defining a seizure in *Graham,* the Supreme court noted that it had "not resolved the question whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins." This statement suggests that "arrest" for fourth amendment purposes encompasses more than the moment of arrest, but continues until pretrial detention begins. In addition, because the statement questions only whether the fourth amendment applies once pretrial protection begins, the statement also implies that fourth amendment protection against excessive force governs at least until pretrial detention begins.

*Sweatt v. Bailey,* 876 F.Supp. 1571, 1581 (M.D.Ala.1995).

The Supreme Court's recent decision in *Albright v. Oliver,* 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), supports such an interpretation of *Graham.* In *Albright,* the Supreme Court was asked to determine whether the Fourteenth Amendment provided a substantive due process right to be free from prosecution without probable cause. The Court held that no such right existed under the general parameters of substantive due process law, and that if such a right did exist at all, the Fourth Amendment would provide that right's explicit textual source of constitutional protection. The Supreme Court stated, "The Framers considered the matter of pretrial deprivations of liberty, and drafted the Fourth Amendment to address it." *Albright, supra,* 510 U.S. at 274, 114 S.Ct. at 813.[4]

---

**4.** In a concurring opinion, Justice Ginsburg seemed to rebuke *Wilkins v. May,* 872 F.2d 190, 192–95 (7th Cir.1989), in which the Seventh Circuit applied a substantive due process analysis to

a claim of excessive force during the post-arrest, pre-charge period. *See, Albright, supra,* 510 U.S. at 277 n. 2, 114 S.Ct. at 815 n. 2. Justice Gins-

This decision is reflective of the Supreme Court's holding in *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854 43 L.Ed.2d 54 (1975). In assessing the constitutional need for a judicial hearing following a warrantless arrest, the Supreme Court recognized that "[b]oth the standards and procedures for arrest and detention have been derived from the Fourth Amendment and its common-law antecedents." *Id.* at 110, 95 S.Ct. at 861. The Supreme Court stated:

[A] policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest. Once the suspect is in custody, however, the reasons that justify dispensing with the magistrate's neutral judgment evaporate.... And, while the State's reasons for taking summary action subside, the suspect's need for a neutral determination of probable cause increases significantly. The consequences of prolonged detention may be more serious than the interference occasioned by arrest. Accordingly, we hold that the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest.

*Id.* at 114, 95 S.Ct. at 863 (citations omitted). Thus in *Gerstein,* the Supreme Court implicitly recognized different stages along the custodial continuum and found that during the period between initial detention and an initial judicial hearing, the protections of the Fourth Amendment are strongly implicated.

The Court finds that the Supreme Court has consistently recognized the particular applicability of the Fourth Amendment to police conduct in the course of a citizen's arrest and incarceration prior to an initial judicial hearing. Accordingly, the Court is persuaded by the decisions of the Sixth, Ninth, and Tenth Circuits, discussed above, holding that the Fourth Amendment applies to claims of excessive force used prior to the time of an initial judicial appearance.

Wherefore, the Court finds that the Fourth Amendment is the specific constitutional right allegedly infringed by the challenged application of force in this case.

## II. Qualified Immunity Of Defendants Sued In Their Individual Capacities

Each defendant has been sued in their individual capacities, and in this regard, each has claimed the affirmative defense of qualified immunity. Under the doctrine of qualified immunity:

[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In the present case, the undisputed facts establish that the defendants were all acting within the scope of their discretionary authority when performing the alleged acts which form the basis of plaintiff's claims. Thus, in determining whether summary judgment in favor of the defendants is appropriate, two questions must be answered. "[F]irst, whether there was a clearly established constitutional right, and second, whether, viewed most favorably to the plaintiff[ ], the alleged facts show a violation of that right." *McKinney v. DeKalb County, Georgia,* 997 F.2d 1440, 1442 (11th Cir.1993) (citing *Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 2816–17, 86 L.Ed.2d 411 (1985)).

### A. Clearly Established Law

■ "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146, 1150 (11th Cir.1994). "Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly

burg also expressed an expansive definition of "seizure," which could include continuing seizure beyond the point at which physical custody

is relinquished. *Id.* at 276–79, 114 S.Ct. at 814–16.

violating the law would have done such a thing, the government actor has immunity from suit." *id.* at 1149.

▮ As stated, the defendants' alleged use of excessive force occurred in the course of plaintiff's arrest in 1992. The law was clearly established by *Graham*, in 1989, that such a use of excessive force violates the Fourth Amendment. Notwithstanding the elaborate legal discussion required to determine whether defendants' specific acts of physical force occurred in a Fourth or a Fourteenth Amendment setting, the law was clearly established in 1992 that the police use of excessive force in the context of the present case would violate either the Fourth or the Fourteenth Amendment.

In 1993, the Eleventh Circuit pronounced that, as of 1990, "[t]he law was clearly established . . . that police use of excessive force is a constitutional violation." *McKinney, supra,* 997 F.2d at 1443. *See also Gilmere v. City of Atlanta,* 774 F.2d 1495, 1501 (11th Cir.1985), *cert. denied,* 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986) (officers liable if a beating occurs "with little or no provocation" and "the blows were not delivered in good faith effort to control . . ., but rather out of irritation"); *Sweatt, supra,* 876 F.Supp. at 1577 ("malicious and summarily punitive infliction of harm transgressed clear constitutional bounds—indeed, bounds so broadly recognized and accepted as to have been incorporated into most of the primary constitutional provisions constraining the conduct of law enforcement officials").

The Court is particularly swayed by the Eleventh Circuit's decision in *United States v. Myers,* in which the Court of Appeals upheld a criminal conviction under the Fourth Amendment, pursuant to 18 U.S.C. § 242, for the post-arrest, pre-charge use of a stun gun against jailed arrestees. *See Myers, supra,* 972 F.2d at 1572. Based on this holding, any reasonable officer would have known at the time of Albritten's arrest that the use of excessive force in an arrest or post-arrest context is both illegal and redressable pursuant to either the Fourth or the Fourteenth Amendment.[5]

### B. Violation Of Fourth Amendment

Having determined that the law was clearly established at the time of defendants' alleged use of excessive force that such a use of force violates the Fourth Amendment, the Court must next determine whether the facts, viewed in the light most favorable to the plaintiff, show a violation of the Fourth Amendment.

"The proper standard for judging Fourth Amendment excessive force claims is set out in *Graham v. Connor* . . . . That standard is objective reasonableness. . . ." *Cottrell v. Caldwell,* 85 F.3d 1480, 1492 (11th Cir.1996). "The question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham, supra,* 490 U.S. at 397, 109 S.Ct. at 1872. Determining reasonableness requires "a careful balancing of the nature and quality of the intrusion on the

---

**5.** Defendants argue that qualified immunity should apply in the present case pursuant to *Swint v. City of Wadley, Alabama,* 5 F.3d 1435 (11th Cir.1993), wherein the Eleventh Circuit held:

> This Court has recently joined the First, Sixth, and Ninth Circuits in purporting to narrow the scope of *Graham,* by holding "that a non-seizure Fourteenth Amendment substantive due process claim of excessive force survives *Graham.*" *Wilson v. Northcutt,* 987 F.2d 719, 722 (11th Cir. 1993).

*Swint, supra,* at 5 F.3d 1448. *Wilson* involved an attempted seizure, pursuant to a valid arrest warrant, which resulted in the suicide of the subject of the warrant prior to her physical capture. Upon finding that the decedent had never been "seized" under the standard set forth in *California v. Hodari D.,* 499 U.S. 621, 624–29,

111 S.Ct. 1547, 1548–52, 113 L.Ed.2d 690 (1991), the Court of Appeals found the Fourth Amendment inapplicable to the plaintiff's claims of excessive force. *Wilson, supra,* 987 F.2d at 722. As quoted above, however, the Court of Appeals found that such "non-seizure" claims of excessive force could fall within the purview of Fourteenth Amendment substantive due process. *Id.* In *Swint,* the Eleventh Circuit pronounced that such a substantive due process right was not clearly established until *Wilson* in 1993, a year after Albritten's arrest. *Swint, supra,* 5 F.3d at 1448. However, *Swint* and *Wilson* are inapplicable to the present case in that the undisputed facts establish, without question, that Albritten had been "seized" within the meaning of *Hodari D.,* thus triggering the application of the Fourth Amendment, discussed in the body of this Order.

individual's Fourth Amendment interests against the countervailing governmental interests at stake .... [and] careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396, 109 S.Ct. at 1872 (internal quotation marks and citations omitted).

■ Read in the light most favorable to the Plaintiff, the facts indicate that the physical force used against Albritten upon his arrival at the Dougherty County Jail was unreasonable. Albritten was moving slowly due to his intoxication and the discomfort of having been handcuffed. As a result of his laziness in responding to the commands of Deputy Roland upon entry to the jail, Albritten was slammed against a wall and beaten as described in the "background" section of this Order.

The three factors set forth in *Graham* do not support the contention that the defendants' use of force was reasonable. Although drunk driving is a serious problem in this nation, it is not typically viewed as a crime which warrants some heightened level of physical force which may lawfully be applied in the course of an arrest, particularly when the arrestee is already at the police station or jail. Further, in the light most favorable to the plaintiff, Albritten did not pose any immediate threat to the safety of any of the police officers present, nor did he attempt to escape at any time.

"Not every push or shove ... violates the Fourth Amendment." *Graham, supra,* 490 U.S. at 396, 109 S.Ct. at 1871–72. However, the Court finds that the injuries suffered by Albritten were significant in that they evidenced that the physical force used against him by the defendants was of the type and amount that would be unreasonable viewing the facts in the light most favorable to the plaintiff.

Albritten contends that the beating began when one of the officers said, "I'm tired of y'all niggers." While objective reasonableness is weighed without regard to the defendant's state of mind, the Eleventh Circuit has recognized "that sometimes words spoken while actions are being taken can be useful to one seeking to determine from all the circumstances the reasonableness of the actions." *Brown v. City of Hialeah,* 30 F.3d 1433, 1436 (11th Cir.1994) (finding reversible error in the exclusion from the jury of testimony of racial slurs made during plaintiff's arrest). In the present case, a showing that the use of force against Albritten was predicated upon race-based animus, would indicate that the force used was beyond that which was reasonable to subdue Albritten in order to search him for drugs and weapons.

In sum, the facts, read in the light most favorable to the plaintiff, show genuine issues of material fact upon which a reasonable fact finder could conclude that defendants' use of physical force against the plaintiff violated the Fourth Amendment. It is the province of the jury, and not the Court on a motion for summary judgment, to resolve these questions of fact. Having previously established that the plaintiff's rights under the Fourth Amendment were clearly established at the time of Albritten's arrest, the defendants' are not entitled to qualified immunity in their individual capacities, except for Hollis Howze as explained below.

## C. Liability Of Bystanding Officers

■ The plaintiff argues that those officers who were in the presence of plaintiff at the time of the alleged use of excessive force should be held liable even if they did not directly make physical contact with the plaintiff. "It is not necessary that a police officer actually participate in the use of excessive force in order to be held liable under section 1983. Rather, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." *Fundiller v. City of Cooper City,* 777 F.2d 1436, 1441–42 (11th Cir.1985). *See Riley v. Newton,* 94 F.3d 632, 636 (11th Cir.1996); *Post v. City of Fort*

*Lauderdale,* 7 F.3d 1552, 1560 (11th Cir. 1993). The Court finds that the record contains genuine questions of material fact upon which a reasonable jury could find that the individual defendants who did not directly assault Albritten, other than Hollis Howze, failed take reasonable steps to protect Albritten from excessive force. However, the record clearly establishes that Hollis Howze was not present in the jail until well after the use of physical force against Albritten had ended, and that Howze's meeting with Albritten that night involved no physical contact. Thus, the record cannot not support a reasonable finding that Hollis Howze, acting in his individual capacity, failed to take reasonable steps to protect Albritten from excessive force.

Thus, to the extent that Defendants' motion for summary judgment pertains to plaintiff's claims against Jon Segroves, Frank Goodwin, Kevin Frier, and Donna Grigsby in their individual capacities, the same is hereby **DENIED–IN–PART.** To the extent that the motion pertains to plaintiff's claims against Hollis Howze in his individual capacity, the same is hereby **GRANTED–IN–PART.**

### III. Claims Against Defendants In Their Official Capacities

 "An official-capacity suit is, in all respects other than name, to be treated as a suit against the entity [for which the official is an agent]." *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). Therefore, "the only immunities available to the defendant in an official-capacity action are those that the governmental entity possesses." *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361–62, 116 L.Ed.2d 301 (1991).

A local government may be sued under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611, 56 L.Ed.2d

611 (1978). *See Brown v. City of Fort Lauderdale,* 923 F.2d 1474, 1479 (11th Cir.1991) (municipal liability under § 1983 can only exist when the deprivation was undertaken pursuant to municipal policy or custom).

 The law of this case establishes that no municipal policy or custom was the moving force behind plaintiff's claimed injuries. In a judgment on Sheriff Jamil Saba's motion for summary judgment, this Court wrote:

> Plaintiff simply has insufficient evidence to maintain this action against the Sheriff. There is no evidence that there is a custom of routinely beating arrestees who are uncooperative. Nor is there evidence that Sheriff Saba has so abrogated his function as the chief law enforcement officer for the county that the conduct of his subordinates constitutes official county policy. Even allowing Plaintiff every inference available from the admissions of Sheriff Saba and Chief Deputy Howze regarding the leeway afforded deputies in the function of their jobs, there is no basis for a finding that the discretion permitted amounts to legally cognizable delegation of policy-making authority.

*Order on Saba Motion for Summary Judgment,* entered January 31, 1994.[6]

Accordingly, to the extent that defendants' motion for summary judgment pertains to plaintiff's excessive force claims against defendants in their official capacities, the same is hereby **GRANTED–IN–PART.**

### IV. Negligent Management Claims Against Howze

In paragraph 24(b) of his second amended complaint, plaintiff asserts that Defendant Howze negligently operated and managed the Dougherty County Jail by "[f]ailing to adopt, incorporate and enforce such rules, regulations, policies and procedures for the operation and management of the Dougherty County Jail as would reasonably protect Plaintiff and others detained or incarcerated in the Dougherty County Jail from the attacks which occurred...." [7]

---

6. The January 31, 1994 Order was issued by The Honorable Duross Fitzpatrick. Although this action has since been transferred to the undersigned, the January 31 Order, as well as all others issued by Judge Fitzpatrick in this action, still serve as the law of the case.

7. On October 5, 1994, plaintiff voluntarily dismissed his other negligent management claims against Hollis Howze, as set forth in paragraphs 24(a) and 24(c) of plaintiff's second amended complaint.

■ Paragraph 24(b), quoted above, is a verbatim copy of paragraph 19(b) of plaintiff's first amended complaint, which claimed negligent management of the Dougherty County Jail by Sheriff Jamil Saba. The Court has already ruled that such a claim fails as a matter of law. *See Order on Saba Motion for Judgment on the Pleadings,* entered September 8, 1993 ("Clearly, negligent operation of a jail is insufficient as a matter of law to provide a remedy to Plaintiff for his injuries"). Plaintiff's claims against Hollis Howze, as set forth in paragraph 24(b) of the second amended complaint fail as a matter of law for the reasons previously expressed by the Court in its Order of September 8, 1993.[8]

Accordingly, insofar as defendants' motion for summary judgment pertains to plaintiff's claims of negligent management of the Dougherty County Jail by Deputy Sheriff Hollis Howze, the same is hereby **GRANTED–IN–PART.**

---

**8.** The Court further notes that plaintiff amended his complaint to add the claims against Hollis Howze, as set forth in paragraph 24 of the second amended complaint, without permission of the Court at a time when such permission was required. The Court's January 31, 1994 Order allowed plaintiff twenty days to amend the complaint so as to substitute real persons for defendants Jane Doe and John Doe. On February 22, 1994, Plaintiff filed his second amended complaint in which he substituted parties in compliance with the January 31 Order. However, Plaintiff further amended the complaint by adding paragraph 24, which is essentially a verbatim copy of Count Two from the original and first amended complaints, except that Hollis Howze is substituted for Jamil Saba. Leave was not granted by the Court for such an amendment, as required by Rule 15 of the Federal Rules of Civil Procedure. However, this procedural error is of no moment, since the Court has previously ruled on the underlying substantive claim, as discussed in the body of this Order.